## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re NATALIE M. NEBBLETT,<br><br>Debtor, | Chapter 11<br>Case No. 11-27398 |
| GE CAPITAL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>NATALIE M. NEBBLETT, GERALD M. SHERMAN, JERSEY SHORE ORTHODONTICS, LLC, and NAT I, LLC,<br><br>Defendants. | A.P. No. _____<br><br><br><br>**COMPLAINT** |

Plaintiff, GE Capital Corporation, by and through its undersigned counsel, by way of Complaint against the Defendants, sounding in fraud and civil conspiracy, states as follows:

### THE PARTIES

1.      Plaintiff GE Capital Corporation ("GE Capital") is a successor in interest to Choice Health Leasing, formerly a trade name of Citicorp Vendor Finance, Inc. GE Capital has an office located at 450 Mamaroneck Avenue, Harrison, NY 10528, among other locations.

*v.2421711/17/11*

2.      Defendant Natalie M. Nebblett, the Debtor in these proceedings, is a New Jersey resident, living at 3 Geraldine Court, Farmingdale, NJ 07727. Upon information and belief, Nebblett is a licensed dentist and currently practices in New Jersey.

3.      Defendant Gerald M. Sherman is, upon information and belief, a New Jersey resident, living with Nebblett and their two children at 3 Geraldine Court, Farmingdale, NJ 07727. Upon information and belief, Sherman professes to work as a self-described "business consultant" but has not disclosed any earned income since 2008. Upon information and belief, Sherman is in the middle of acrimonious divorce proceedings from his wife of more than thirty years, Judith A. Sherman, in which Mrs. Sherman has alleged that Mr. Sherman improperly conveyed substantial marital assets to Nebblett, and that he and Nebblett conceal their true income and assets.

4.      Jersey Shore Orthodontics, LLC ("Jersey Shore") is, upon information and belief, a New Jersey limited liability company solely owned and operated by Nebblett out of her home address.

5.      NAT I, LLC ("NAT I") is, upon information and belief, a New Jersey limited liability company solely owned and operated by Nebblett out of her home address.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1334.

7.      This matter is a civil proceeding arising under Title 11 or arising in or related to a case under Title 11 within the meaning of 28 U.S.C. § 157.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(A), (B), (E), (H), (I) and (O).

9.      Venue is properly laid in this district pursuant to 28 U.S.C. § 1409.

## STATEMENT OF FACTS

### General Background

10.      On or about June 5, 2008 the Debtor, Natalie M. Nebblett, entered into a finance and progress payment agreement (the "Contract"), whereby GE Capital[1] extended to Nebblett approximately $400,000.00 in the form of working capital and third party vendor and contractor payments, for the purpose of financing the build-out and set-up of a dental office in Neptune, New Jersey.

11.      Instead of hiring a licensed general contractor to handle the build-out and set-up of her dental office, Nebblett elected to use the unlicensed "services" of Defendant Gerald M. Sherman and to enter into prolonged lease negotiations with Sherman's long-time business associate and well-known fraudster and felon, Solomon Dwek.[2]

---

[1] For purposes of simplicity, "GE Capital" shall refer herein to Plaintiff, GE Capital Corporation, as well as its predecessors in interest, Choice Health Leasing and Citicorp Vendor Finance, Inc.

[2] Dwek has been described as "the central figure in the biggest federal corruption sting in New Jersey history." See <<http://www.nj.com/news/index.ssf/2011/04/ fbi_informant_solomon_dweks_se.html>> (last accessed Nov. 7, 2010).

*v.2421711/17/11*

12.     As a foreseeable consequence of using an unlicensed general contractor and dealing with a fraudster instead of a legitimate and reputable landlord, Nebblett never signed a lease and otherwise failed to set up an office. Instead, Sherman, on Nebblett's behalf, fraudulently obtained "refunds" from various third party vendors and contractors, diverted this money into accounts held in the name of Nebblett's two companies, Jersey Shore Orthodontics, LLC, and NAT I, LLC, and used this money for Nebblett's and Sherman's personal expenses.

13.     In addition to this unauthorized diversion and misuse of GE Capital's money, Nebblett and Sherman further defrauded GE Capital by invoicing and otherwise arranging for GE Capital to pay Sherman approximately $50,000.00 for serving as a general contractor, while concealing that, in fact, Sherman was never licensed as a general contractor, failed to perform the work for which he was ostensibly hired, and did nothing to earn this money.

14.     As part and parcel of the Defendants' continuing fraudulent scheme, Nebblett, who was at all pertinent times employed full-time as an orthodontist earning well in excess of $200,000 per year,[3] intentionally failed and refused to pay GE Capital any money whatsoever, except for one (1) payment of approximately $5000.

15.     On March 18, 2011, the Superior Court of New Jersey entered summary judgment against Nebblett and in favor of GE Capital, in the amount of $405,148.53, as of April 1, 2010, plus pre-judgment interest accruing at 16% annual interest, plus post-

---

[3] Nebblett reported earning $225,797.00 in adjusted gross income in 2009, and $327,813.00 in 2010.

                                     v.2421711/17/11

judgment interest and GE Capital's recoverable costs and expenses, including without limitation its reasonable attorneys' fees and other costs.

16.     Instead of paying a single penny towards satisfaction of that judgment, and despite earning substantial income from two separate employers, Nebblett elected to file for Chapter 11 bankruptcy.

17.     Nebblett filed for bankruptcy not out of financial hardship, but rather as part and parcel of Defendants' ongoing scheme to defraud GE Capital of its money.

18.     As of the date of Nebblett's Chapter 11 filing, GE Capital's claim amounts to $470,047.47, as set forth below:

| | | |
|---|---|---|
| **damages (*as of 4/1/2010*)** | **$405,148.53** | |
| annual prejudgment interest | 16% | |
| fraction of year (prejudgment) | 0.961643836 | |
| **prejudgment interest** | **$62,337.37** | *($405,148.53 x 16% x .961643836)* |
| **subtotal (*as of 3/18/2011*)** | **$467,485.90** | |
| annual postjudgment interest | 2.50% | (<u>cf.</u> N.J. Court Rule 4:42-11) |
| fraction of year (postjudgment, until filing) | 0.219178082 | |
| **postjudgment interest** | **$2,561.57** | *($467,485.90 x 2.50% x .219178082)* |
| **total (as of Debtor's Chapter 11 filing)** | **$470,047.47** | |

19.     Moreover, GE Capital has a perfected blanket security interest over <u>all</u> of Nebblett's assets.

20.     Furthermore, in executing the Contract, Nebblett granted GE Capital a security interest in all furnishings and equipment financed by GE Capital, and all proceeds and products thereof.

21.     Nebblett has admitted that she, personally, is in possession of approximately $30,000 of such equipment, and that one vendor, Henry Schein, Inc., holds another $30,000 of equipment in storage

22.    Nebblett has failed to provide an itemized breakdown and appraisal of said collateral.

23.    On information and belief, Nebblett is in possession and/or control of additional collateral, in an amount that may significantly exceed her disclosures to date.

24.    In light of same, GE Capital is filing the within adversary proceeding complaint, objecting to dischargeability of Nebblett's debt to GE Capital and asserting claims against Nebblett, Sherman, and Nebblett's two solely-owned companies, sounding in fraud, civil conspiracy, and unjust enrichment.

**Fraudulent "General Contractor" Invoices**

25.    GE Capital paid Sherman $48,550.00 in two payments, dated on or about October 2, 2008 and January 8, 2009.

26.    Said payments were made by request of Nebblett and Sherman and pursuant to invoices submitted by them.

27.    In requesting these payments, Nebblett and Sherman knowingly misrepresented that Sherman was serving as general contractor with respect to the build-out of Nebblett's dental office at 10 Neptune Road, Neptune, New Jersey.

28.    Sherman is not and never was licensed as a general contractor, in any jurisdiction.

29.    Sherman did not perform the services for which he was paid.

30.    Sherman did not report these payments as income to the IRS until more than two years later, on or about April 28, 2011.

*v.2421711/17/11*

31.     Instead, Nebblett and Sherman deposited these payments in a bank account controlled by Nebblett, personally, and used this money to pay for Nebblett's and Sherman's ongoing household and other personal expenses.

32.     As such, Nebblett and Sherman obtained a direct pecuniary benefit by misrepresenting to GE Capital that Sherman was a general contractor, by fraudulently billing GE Capital for general contractor services that were never rendered, and by unjustly retaining the monies even after Nebblett abandoned her plans to set up a dental office.

## Brannagan Plumbing & Heating

33.     In or around September 2008, Nebblett and Sherman asked Brannagan Plumbing & Heating, Inc. ("Brannagan") to prepare estimates for plumbing work for Nebblett's new dental office.

34.     On or about January 5, 2009, Brannagan prepared an estimate for said work, in the amount of $27,870.00.

35.     Nebblett and Sherman submitted said estimate to GE Capital for payment.

*First Fraudulent Transfer*

36.     On or about January 13, 2009, GE Capital paid Brannagan $27,870.00, in one payment, in reliance on Nebblett's and Sherman's representations that said work would be performed.

*v.2421711/17/11*

37.     Shortly thereafter, Sherman demanded that Brannagan pay him, personally, a $10,000.00 "refund."

38.     After Brannagan refused, Sherman, acting on behalf of Nebblett, demanded that the "refund" be issued instead to Nebblett's solely owned company, Defendant NAT I, LLC ("NAT I").

39.     On or about February 3, 2009, pursuant to Nebblett's and Sherman's demand, Brannagan issued a $10,000.00 "refund" check, made payable to NAT I.

40.     Sherman, acting on behalf of Nebblett and NAT I, deposited this check into NAT I's bank account, controlled by Nebblett, personally.

41.     Nebblett and Sherman subsequently used this money to pay for Nebblett's and Sherman's ongoing household and other personal expenses.

42.     As such, Nebblett, Sherman and NAT I obtained a direct pecuniary benefit by fraudulently conveying this money to NAT I and subsequently using it for their own personal expenses, and by unjustly retaining this money even after Nebblett abandoned her plans to set up a dental office.

*First Fraudulent Misuse of Funds*

43.     In or around April 2009, Sherman, acting on behalf of himself and Nebblett, arranged for Brannagan to repair a toilet and install a garbage disposal  in the kitchen sink in his and Nebblett's home.

*v.2421711/17/11*

44.     Around that same time, Sherman, again acting on behalf of himself and

Nebblett, arranged for Brannagan to perform an emergency service call at their home in

response to a gas leak.

45.     Even though these services were residential in nature and in no way

related to Nebblett's dental office, Sherman instructed Brannagan to bill these services

against the money paid by GE Capital for purposes of the dental office build-out.

46.     As such, Nebblett and Sherman obtained a direct pecuniary benefit by

fraudulently misusing GE Capital's money for their own personal expenses, instead of

for the business purpose for which it was advanced.

*Second Fraudulent Transfer*

47.     In or around June 2009, Sherman, acting on behalf of Nebblett, demanded

that Brannagan issue a second "refund," this time in the amount of $2,500.

48.     On or about June 4, 2009, pursuant to Nebblett's and Sherman's demand,

Brannagan issued a $2,500.00 "refund" check, again made payable to NAT I.

49.     Sherman, acting on behalf of Nebblett and NAT I, deposited this check

into NAT I's bank account, controlled by Nebblett, personally.

50.     Nebblett and Sherman subsequently used this money to pay for Nebblett's

and Sherman's ongoing household and other personal expenses.

51.     As such, Nebblett, Sherman and NAT I obtained a direct pecuniary benefit

by fraudulently conveying this money to NAT I and subsequently using it for their own

personal expenses, and by unjustly retaining this money even after Nebblett abandoned her plans to set up a dental office.

*Third Fraudulent Transfer*

52.     In or around July 2009, Sherman, acting on behalf of Nebblett, demanded that Brannagan issue a third "refund," again in the amount of $2,500.

53.     On or about July 27, 2009, pursuant to Nebblett's and Sherman's demand, Brannagan issued another $2,500.00 "refund" check, again made payable to NAT I.

54.     Sherman, acting on behalf of Nebblett and NAT I, deposited this check into NAT I's bank account, controlled by Nebblett, personally.

55.     Nebblett and Sherman subsequently used this money to pay for Nebblett's and Sherman's ongoing household and other personal expenses.

56.     As such, Nebblett, Sherman and NAT I obtained a direct pecuniary benefit by fraudulently conveying this money to NAT I and subsequently using it for their own personal expenses, and by unjustly retaining this money even after Nebblett abandoned her plans to set up a dental office.

## Douglas R.  Newman, Inc.

57.     In or around November 2008, Nebblett and Sherman asked Douglas R. Newman, Inc. ("Newman") to prepare estimates for electrical work for Nebblett's new dental office, and also for electrical work at Nebblett's and Sherman's home.

58.     Sherman, acting on behalf of himself and Nebblett, expressly instructed Newman that the work at their home would be paid using funds provided by GE Capital.

59.     On or about November 10, 2008, Newman prepared an estimate for the work at Nebblett's office, in the amount of $22,900.00 (the "Initial Office Estimate"), and another estimate for the work at Nebblett's and Sherman's home, in the amount of $1,930.00 (the "Home Estimate").

60.     In or around January 2009, Sherman, acting on behalf of himself and Nebblett, expressly instructed Newman to prepare a single, revised estimate, in the amount of $26,800.00 (the "Revised Estimate").

61.     On or about January 6, 2009, pursuant to Sherman's instructions, Newman prepared the Revised Estimate for the amount specified by Sherman.

62.     Pursuant to Sherman's instructions, the Revised Office Estimate was identical in scope of office-related electrical work to be performed, but was priced $3,900.00 higher than the Initial Office Estimate.

63.     Sherman instructed Newman to prepare the higher, Revised Estimate for the purpose of diverting and misusing GE Capital's money to pay for Newman's work at his and Nebblett's personal expenses, instead of for the business purpose for which it was advanced.

64.     Nebblett and Sherman submitted the Revised Estimate to GE Capital for payment.

   v.2421711/17/11

*Fourth Fraudulent Transfer*

65.     On or about January 13, 2009, GE Capital paid Newman $26,800.00, in one payment, in reliance on Nebblett's and Sherman's representations that said work would be performed and that this money would be used for the business purpose for which it was advanced and not for their own personal expenses.

66.     Shortly thereafter, Sherman, acting on behalf of Nebblett and NAT I, demanded that Newman pay a $10,000.00 "refund" to NAT I.

67.     On or about February 4, 2009, pursuant to Nebblett's and Sherman's demand, Newman issued a $10,000.00 "refund" check, made payable to NAT I.

68.     Sherman, acting on behalf of Nebblett and NAT I, deposited this check into NAT I's bank account, controlled by Nebblett, personally.

69.     Nebblett and Sherman subsequently used this money to pay for Nebblett's and Sherman's ongoing household and other personal expenses.

70.     As such, Nebblett, Sherman and NAT I obtained a direct pecuniary benefit by fraudulently conveying this money to NAT I and subsequently using it for their own personal expenses, and by unjustly retaining this money even after Nebblett abandoned her plans to set up a dental office.

*Fifth Fraudulent Transfer*

71.     In or around April 2009, Sherman, acting on behalf of Nebblett and NAT I, demanded that Newman "refund" the remaining money, paid by GE Capital pursuant to the Revised Estimate, to NAT I.

*v.2421711/17/11*

72.     On or about May 1, 2009, pursuant to Nebblett's and Sherman's demand, Newman issued a $16,500.00 "refund" check, made payable to NAT I, and retained only $300.00 for his time and expenses.

73.     Sherman, acting on behalf of Nebblett and NAT I, deposited this check into NAT I's bank account, controlled by Nebblett, personally.

74.     Nebblett and Sherman subsequently used this money to pay for Nebblett's and Sherman's ongoing household and other personal expenses.

75.     As such, Nebblett, Sherman and NAT I obtained a direct pecuniary benefit by fraudulently conveying this money to NAT I and subsequently using it for their own personal expenses, and by unjustly retaining this money even after Nebblett abandoned her plans to set up a dental office.

**Optimum Effects, LLC**

76.     In or around July 2008, Nebblett and Sherman asked Optimum Effects, LLC ("Optimum") to prepare an invoice for multimedia and related electronic equipment for Nebblett's new dental office.

77.     During all times pertinent to this Complaint, Optimum was solely owned and operated by Sherman's cousin, Robert F. Stone.

78.     Shortly thereafter, Newman prepared an invoice, pursuant to Sherman's instructions, in the amount of $20,276.50.

79.     Nebblett and Sherman submitted the invoice to GE Capital for payment.

*Sixth Fraudulent Transfer*

80.    On or about July 22, 2008, GE Capital paid Optimum $20,276.50, in one payment, in reliance on Nebblett's and Sherman's representations that said equipment would be purchased and installed at Nebblett's dental office and that this money would be used for the business purpose for which it was advanced and not for their own personal expenses.

81.    Shortly thereafter, Sherman, acting on behalf of Nebblett, demanded that Optimum "refund" $10,000.00 of this money to Nebblett.

82.    On or about August 1, 2008, pursuant to Nebblett's and Sherman's demand, Optimum issued a $10,000.00 "refund" check, made payable to Nebblett, personally.

83.    On or about August 4, 2008, Nebblett and/or Sherman deposited this check into Nebblett's personal bank account.

84.    Nebblett and Sherman subsequently used this money to pay for Nebblett's and Sherman's ongoing household and other personal expenses.

85.    As such, Nebblett and Sherman obtained a direct pecuniary benefit by fraudulently conveying this money from Optimum to Nebblett, personally, and subsequently using it for their own personal expenses, and by unjustly retaining this money even after Nebblett abandoned her plans to set up a dental office.

*v.2421711/17/11*

*Second Fraudulent Misuse of Funds*

86.     Using the remaining money, Optimum purchased numerous pieces of electrical equipment pursuant to Nebblett's and Sherman's instructions, including but not limited to: flat screen TVs, speaker systems, volume controls, mounting brackets, CD changer, telephone system, audio receivers, line conditioners, surge protectors, video game systems, video games, universal remote controls, AV wire and cables, and related items.

87.     Subsequently, pursuant to Nebblett's and Sherman's instructions, Optimum delivered this equipment to their home.

88.     Upon information and belief, Nebblett and Sherman converted some of these items to their own personal use.

89.     As such, Nebblett and Sherman obtained a direct pecuniary benefit by fraudulently misusing GE Capital's money for their own personal benefit and use, instead of for the business purpose for which it was advanced.

90.     Nebblett and Sherman also obtained a further pecuniary benefit, by leveraging their GE Capital-financed business dealings with Optimum in order to obtain an additional $29,000.00 as a personal loan to Sherman from Optimum's owner, Robert F. Stone.

91.     As part and parcel on their continuing practice of defrauding creditors in order to finance their lifestyle, neither Sherman nor Nebblett ever repaid to Stone a single penny of that $29,000.00 personal loan.[4]

**Fraudulent Misuse of Working Capital**

92.     In addition to third party vendor and contractor payments, GE Capital provided Nebblett with $75,000.00 in working capital.

93.     Pursuant to the Contract, the purpose of this working capital was to enable Nebblett, by and through Jersey Shore, to set up and operate a dental office.

94.     On information and belief, Nebblett and Sherman deposited this working capital into accounts held in the name of Jersey Shore, NAT I, and/or Nebblett, personally.

95.     At no time pertinent to this Complaint did Nebblett and/or Jersey Shore ever open a dental office.

96.     Instead of using the working capital to pay ongoing business expenses related to operating a dental office, Nebblett and Sherman used this money, funneled through the foregoing accounts, to pay for Nebblett's and Sherman's ongoing household and other personal expenses.

97.     As such, Nebblett and Sherman obtained a direct pecuniary benefit by fraudulently misusing GE Capital's money for their own personal benefit and use,

---

[4] GE Capital does not allege that this $29,000.00 debt is part of GE Capital's damages.

instead of for the business purpose for which it was advanced, and by unjustly retaining this money even after Nebblett abandoned her plans to set up a dental office.

## COUNT I - OBJECTION TO DISCHARGEABILITY

98.     GE Capital incorporates the allegations set forth in the preceding paragraphs as if set forth fully herein.

99.     As set forth in detail above, Nebblett engaged in an ongoing pattern of fraudulent activity with respect to the Contract and the money extended to Nebblett by GE Capital pursuant to the Contract.

100.     Said activity included, among other things:

a.  fraudulently obtaining $48,550.00 paid to Sherman for general contractor services that Sherman was not licensed to perform and in fact did not perform;

b.  obtaining fraudulent "refunds" of monies paid by GE Capital to third party vendors and contractors for the express business purpose of setting up and operating a dental practice, and instead using these monies for Nebblett's and Sherman's personal use and enjoyment;

c.  fraudulently misusing GE Capital's money to pay for residential contractor services instead of a legitimate business-related purpose consistent with the terms of the Contract;

v.2421711/17/11

d.   converting personal property financed by GE Capital for her own personal use and enjoyment, instead of a legitimate business-related use consistent with the terms of the Contract; and

e.   fraudulently misusing working capital provided by GE Capital for her own personal use and enjoyment, instead of a legitimate business-related use consistent with the terms of the Contract.

101.   Said activity further included Nebblett's initial act of entering into the Contract and obtaining credit and vendor financing from GE Capital, when Nebblett had no intention of ever repaying the money.

102.   Nebblett's fraudulent conduct was willful and malicious.

103.   As a result of Nebblett's fraudulent conduct, GE Capital has suffered damages in the amount of $470,047.47, as of the date of Nebblett's bankruptcy filing, plus attorney's fees and costs.

104.   By virtue of Nebblett's fraudulent conduct, her debt to GE Capital is nondischargeable under 11 U.S.C. § 523(a)(2) and (6).

## COUNT II – FRAUD

105.   GE Capital incorporates the allegations set forth in the preceding paragraphs as if set forth fully herein.

106.   As set forth in detail above, the Defendants engaged in an ongoing pattern of fraudulent activity with respect to the Contract and the money extended to Nebblett by GE Capital pursuant to the Contract.

   v.2421711/17/11

107.    Said activity included, among other things:

a.    intentionally misrepresenting to GE Capital that Sherman would provide general contractor services, when in fact Sherman was not licensed as a general contractor and could not legally perform such services;

b.    submitting intentionally inflated and fraudulent vendor invoices to GE Capital to pay for repairs and services at Nebblett's and Sherman's home, instead of a legitimate business-related purpose consistent with the terms of the Contract; and

c.    intentionally misrepresenting to GE Capital that funds designated as "working capital" would in fact be used for a legitimate business-related purpose consistent with the terms of the Contract, rather than for their own personal use and enjoyment.

108.    The Defendants intended that GE Capital would rely on said misrepresentations.

109.    GE Capital did in fact rely on Defendants' misrepresentations.

110.    Defendants' misconduct was willful and malicious.

111.    As a result of Defendants' misconduct, GE Capital incurred pecuniary damages in the amount of $470,047.47, plus interest, attorney's fees and costs.

## COUNT III – FRAUDULENT TRANSFERS

112.    GE Capital incorporates the allegations set forth in the preceding paragraphs as if set forth fully herein.

*v.2421711/17/11*

113.    As set forth in detail above, the Defendants engaged in an ongoing pattern of fraudulent transfers with respect to the money extended to Nebblett by GE Capital pursuant to the Contract, repeatedly procuring fraudulent "refunds" of third party vendor payments, depositing this money into bank accounts held by Nebbett, Jersey Shore, and/or NAT I, and using this money to pay for Nebblett's and Sherman's ongoing household and other personal expenses.

114.    At no time did GE Capital consent to Defendants' diversion of its funds in this manner for their own personal benefit and enjoyment.

115.    Defendants' misconduct had no legitimate business-related purpose consistent with the terms of the Contract but was instead intended to defraud GE Capital and to hinder its efforts to procure repayment of the monies extended.

116.    Said transfers constitute fraudulent conveyances under New Jersey's Fraudulent Conveyance Act and Uniform Fraudulent Transfer Act.

117.    Defendants' misconduct was willful and malicious.

118.    As a result of Defendants' misconduct, GE Capital incurred pecuniary damages in the amount of $470,047.47, plus interest, attorney's fees and costs.

## COUNT IV – CIVIL CONSPIRACY

119.    GE Capital incorporates the allegations set forth in the preceding paragraphs as if set forth fully herein.

120.    As set forth in detail above, the Defendants knowingly and intentionally engaged in an ongoing pattern of fraudulent misrepresentations and fraudulent

*v.2421711/17/11*

transfers with respect to the Contract and the money extended to Nebblett by GE Capital pursuant to the Contract.

121.   The Defendants each agreed to the essential nature and purpose of this scheme, which was to obtain money from GE Capital, funnel it into various accounts held by Nebblett and/or her solely owned companies, Jersey Shore and NAT I, use the money to pay for Nebblett's and Sherman's ongoing household and other personal expenses instead of a legitimate business-related purpose consistent with the terms of the Contract, and then avoid repaying GE Capital any part of the money provided.

122.   Defendants' misconduct was willful and malicious.

123.   As a result of Defendants' misconduct, GE Capital incurred pecuniary damages in the amount of $470,047.47, plus interest, attorney's fees and costs.

## COUNT V – UNJUST ENRICHMENT

124.   GE Capital incorporates the allegations set forth in the preceding paragraphs as if set forth fully herein.

125.   GE Capital extended to Nebblett approximately $400,000.00 in the form of working capital and third party vendor and contractor payments, for the purpose of financing the build-out and set-up of a dental office in Neptune, New Jersey.

126.   Instead of engaging in bona fide efforts to set up an office, Nebblett elected to employ Sherman as an unlicensed "general contractor" and to enter into prolonged and foreseeably futile lease negotiations with Sherman's long-time business associate and well-known fraudster and felon, Solomon Dwek.

*v.2421711/17/11*

127. Instead of using GE Capital's money for a legitimate business-related purpose consistent with the terms of the Contract, the Defendants used the money for their own personal use and enjoyment and for paying their ongoing household and other personal expenses.

128. Except for a single payment in the amount of $5,128.47, made by Jersey Shore on or about October 29, 2010, the Defendants have intentionally failed and refused to repay to GE Capital any part of this money.

129. Defendants' misconduct was willful and malicious.

130. It would be patently unjust to permit the Defendants to retain GE Capital's money, and the products and proceeds thereof, without payment of the full amount owed.

131. As a result of Defendants' misconduct, GE Capital incurred pecuniary damages in the amount of $470,047.47, plus interest, attorney's fees and costs.

**WHEREFORE**, Plaintiff, GE Capital Corporation, respectfully requests that the Court enter an order granting the following relief:

(1) declaring that Debtor's debt to Plaintiff, in the amount of $470,047.47, plus statutory interest from the date of commencement of this action, is non-dischargeable, pursuant to 11 U.S.C. § 523(a)(2) and (6);

(2) entering judgment in favor of Plaintiff and against the Defendants, jointly and severally, in the amount of $470,047.47, plus statutory interest from

the date of commencement of this action, plus punitive damages and

reasonable attorney's fees and costs; and

(3)    such other and further relief as the Court may deem just.


**WONG◆FLEMING**
**A Professional Corporation**
*Attorneys for GE Capital Corporation*
821 Alexander Road, Suite 150
P.O. Box 3663
Princeton, New Jersey 08543-3663

Dated: November 17, 2011            By: _____/s/ Jonathan R. Miller_____
                                                    Jonathan R. Miller

*v.2421711/17/11*